## SINGER v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Second Department. April 23, 1909.)

Appeal from Trial Term, Rockland County.

Action by Leonard Singer, as administrator of Edith L. Singer, deceased, against the New York Central & Hudson River Railroad Company. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Judgment modified and affirmed.

Argued before HIRSCHBERG, P. J., and WOODWARD, RICH, JENKS, and MILLER, JJ.

John F. Brennan, for appellant.
Albert A. Wray, for respondent.

PER CURIAM. Judgment modified, by striking out the provision for extra allowance, and the judgment, as thus modified, and order denying motion for a new trial, affirmed, without costs.

JENKS, J. I dissent. I think that a new trial should be granted because the verdict is against the evidence. McDonald v. Met. St.

Railroad Co., 167 N. Y. 70, 60 N. E. 282. The action is for negligence. Plaintiff's intestate, a young woman 19 years old, with a number of young men and women, went to the village of Nyack to attend a festivity. To return home she and some of her companions left that village shortly after 12 o'clock midnight. The night was one of clear starlight. They were driven in a wagonette, arranged with a seat in front for the driver and two other persons, and with two seats inside, running lengthwise, to hold three persons on each side. The vehicle was curtained on the sides. The front seat was occupied by the driver and two of the party, including plaintiff's intestate, and the inside seats were filled with her companions. The wagonette, drawn by a team of horses, was driven along the Nyack turnpike, which crosses defendant's rails at grade and at right angles. It was struck and shattered at this crossing by the defendant's express train, which was some hours late. The horses escaped unscathed. The plaintiff's intestate and seven other people in the vehicle were killed. This crossing was guarded by gates on each side of it, known as the east and west gates.

The main issue litigated was whether these gates at the time were up as an invitation, or were down as a barrier. The gates were alike. They were hinged on gateposts and were both controlled by one lever swiftly worked by one man. A gate, when lowered, extended a single wooden arm across the highway about 3½ feet above it. There was a lantern on each gate, which hung over the highway when it was lowered. There is evidence that, if the tip of either gate was broken, the counterbalancing weights would automatically throw up the gates. After the collision both gates were found in almost vertical position. The tip of the east gate was broken off, beginning at a point 9 feet from the end. The tip of the west gate was broken off, and one of the planks of the arm was shattered at its end and broken loose. The east gate was the first gate in the line of approach.

The evidence of the plaintiff to establish that the gates were raised, so as to permit access, is as follows: Palmer, one of the passengers and the sole survivor of the party, with the exception of the young woman, Bird, was the last one on the rear seat in the back, and Miss Bird sat opposite to him. The side curtains of the vehicle were closed when they left Nyack. There was a curtain by the driver's seat which was rolled up. The horses were driven out from Nyack over the crossing on a jog trot. He saw the driver, just before the horses approached the crossing, bend forward and look, turning his head both ways. His words are:

"As the horses and wagon came to the crossing, they didn't come in contact with anything. I knew that there were gates at that crossing. As the wagon approached the crossing, I raised up in my seat and looked for the gate. I didn't see the gates, or either of them. I raised up and looked. I saw the lights in the hotel across the track, on the other side of the track, and I saw the roadbed of the track and rails."

He testifies that up to the time that the wagon passed over one of the rails it had not come in contact with anything. The horses had not come in contact with anything.

"I looked out through the front of the wagon. I saw between the driver and Miss Singer. * * * I mean between their heads."

They were then about 100 feet from the track.

"I looked to see if the gates were down. I looked to see if the gates were down, because they ought to have been down if a train were going by. * * * I just raised up and looked out in this space of 8 or 10 inches wide, and then sat down again. * * * I saw the lights of the hotel. I am sure they were in the hotel. In any event I am sure I saw lights."

When asked whether he had stated, five days after the accident, to Dr. Walscheim as follows: "I did not see the gates, and did not know whether the gates were up or down"—the witness answered:

"Not that I know of; but I may have said it. If I did say it, it was not true. If I told him that, I lied to him, because I know the gates were not down; but I don't know whether I told him that or not."

He also admitted that he remembered making a statement to the coroner, Van Orden; but he testified that he did not in substance say to him that he did not know whether the gates were up or down. After some further cross-examination he was asked:

"Q. Didn't you say this [on a former trial]: 'As I approached the gates I looked to see whether the gates were down; but I didn't see them down, or I did not see them up—in fact, I did not see the gates at all.' Is that what you told him? A. Yes, sir; I didn't tell him in that way exactly. He asked me if I saw the gates down as I approached the crossing, and he wrote down something. Q. 'As I approached the gates, I looked to see whether the gates were down; but I didn't see them down, or I did not see them up—in fact, I did not see the gates at all.' Is that what you told him? A. Yes, sir.

"The Court: Did you testify to that on the former trial?

"The Witness: Yes.

"Q. Is that true? A. Was it true that I made that statement?

"The Court: Was that true when you testified to it?

"The Witness: I don't know what you mean.

"The Court: You have heard Mr. Patterson read from the testimony?

"The Witness: Yes.

"The Court: Now he asks you whether you gave that testimony on the former trial or not?

"The Witness: Yes.

"The Court: When you gave it, was it true, and did you believe it to be true?

"The Witness: Yes.

"Q. Do you believe it now to be true?

"The Court: Do you believe it now, as read from the testimony?

"Counsel for the Plaintiff: Will Mr. Patterson read it again?

"The Court: Yes. Listen and tell whether the testimony is true, or whether, when you gave it on the former trial, you believed it to be true.

"Counsel for the Plaintiff: We take an objection to that.

"The Court: Mr. McCauley asked that the question be re-read. There is nothing to object to.

"Q. Did you on the former trial testify to that?

"The Court: He has already said that he gave that testimony, and that he believed it to be true.

"Q. Do you believe it now to be true? A. Yes; I know the gates were not down. I couldn't see them, and I couldn't see them up, if I had looked for them. Q. You have just testified that this testimony is true: 'You don't know whether the gates were up or down?' A. I know they were not down. Q. You testified on the previous trial that you didn't see the gates at all, and didn't know whether they were up or down?

"The Court: When he said on the former trial that he didn't know whether they were up or down he meant he didn't see them up or down, and he means by that that if they had been down he would have seen them.

"The Witness: I testified that I didn't see them up on account of the wagon being closed. I don't remember telling Dr. Walscheim that I didn't know whether the gates were up or down. When I raised up in the seat, in the wagon, I could have seen the gates if they had been down, and I could have seen the lights, and I didn't see either. It was a bright, starlight night. I couldn't say as to the moon. My only basis for saying that they were up is the fact that I didn't see them down. I know they were not down. If they had been down I would have seen them."

Mr. Van Orden, the coroner, and the individual referred to in the preceding excerpt, testifies that he took a statement of the witness Palmer; and when asked: "In that statement did he say that he 'could not say whether we were trotting or walking when we reached the gates at the West Shore crossing. As we approached the gates I looked to see if they were down or not, but I did not see them down. I did not see them up; in fact, I did not see the gates at all?'"—answered:

"He said the last part. The first part I could not swear to. He said: 'I did not see the gates up.' I have my minutes here. * * * 'As we approached the gates I looked to see if the gates were down or not, and I did not see them down, nor did I see them up; in fact, I did not see the gates at all.'"

Dr. Poole, a physician connected with the North Hudson Hospital, testifies that he had a conversation with Mr. Palmer when he was an inmate of the hospital on the 4th of March, after the accident, and that the witness said to him in words or substance:

" 'I cannot remember anything about the accident, other than that there was a crash and some confusion.' He also said: 'I can say nothing about the gates, or any lights, as I was paying no attention to the road or to the driver.' The condition of Mr. Palmer at that time was perfectly rational."

Miss Bird, the other survivor of the party, remembers the fact of the wagon approaching the crossing. She says that she looked as they were approaching the highway crossing on their way home, about 60 feet distant, and that she had seen Mr. Palmer lean forward before she looked. She testifies that she saw the tracks, and beyond the tracks. She saw a light on the west side of the track. She could not say whether it was on the building or inside of the building. She did not see any other lights, other than the one west of the track.

"I did not see anything in the highway, or across it, east of the track."

She said she did not see any light at all east of the track, and in or over the highway.

"I did not see a gate on the easterly side of the railway as I looked forward out of the coach. I did not see anything at all in the highway, or above it, east of the track, as I looked towards the west. As the wagon went on towards the crossing, the horses or the wagon did not come in contact with any obstruction. I did not hear the horses strike anything, or the wagon strike anything, before they passed upon the crossing."

The coroner, Van Orden, testified that Miss Bird had said to him that she saw neither the gates nor the guard at the west side of the crossing. Dr. Poole testified that she had said to him:

"I have an indistinct recollection of a crash and some confusion, and people shouting in the wagon for a second of time."

Defendant's witness Kane, assistant claim agent, testified that Miss Bird said to him:

"I did not know that we were approaching the railroad track."

This is all of the testimony elicited by the plaintiff from witnesses to sustain his proposition that the gates were up at the time the vehicle went upon the tracks, save that he contends that the testimony of the conductor of the train, who was in the last car, that he heard something scrape over the roof, and that its smoke jacket was broken loose, sustains his proposition. The learned counsel for the plaintiff admits in his brief very frankly:

"Both plaintiff and defendant rely upon inferences to be drawn from facts and circumstances proven concerning the working of the gates and the condition of the gates themselves, and of the crossing, to substantiate, on the one part the cause of action, and on the other the defense."

And he insists that his contention that the gates were up is further sustained by inference from the facts that the horses, with their harness, breast yoke, whiffletrees, and the pole of the wagon, were found in front of their own stable without a scratch or a bruise (except that the check line on one of the horses was broken), and that the front axle was still attached to the pole and the left wheel was still fastened upon it, although the axle was bent so that the hub rested and revolved upon the ground. This, he submits, is conclusive proof that the wagon was struck somewhere back of the front axle, and, furthermore, that the horses did not strike either gate, because it is most improbable that the horses could have run into either gate and escaped some scratch, bruise, or injury, either in breaking through the easterly gate, or, if the westerly gate could have been held down until they arrived there, in getting through that gate.

The defendant called the gateman, Kaufman, on duty that night, who testifies that, as was his practice, he lowered the gates into their proper place across the roadway about 12 o'clock, and that thereafter he went into his adjacent shanty, near the place from which the gates were worked, ate his lunch, then went to the station and attended to certain duties there, and that he was busy in shaking down the grate of the stove in the station when he heard the crash. He went out on the crossing and saw that the gates were broken. The defendant also called Iserman, a liveryman, who testifies that on the night of the accident he went to the gateman Kaufman's shanty, as was his custom, after he put up his horses; that he stood there talking a little while, having found Kaufman on the steps of the shanty; that he remained there 15 to 25 minutes; that he then went out, and Kaufman went with him; that he said, "good night," and went across the railroad tracks; that Kaufman started to put the gates down, but held the gates up until the witness got through under them, after which the witness cried, "All right." Iserman saw the gates come all the way down into their sockets. He did not see the accident, or hear of it until next morning; but he heard a wagon or team go past his house, which was nearby, after

he reached his home, and about 15 or 20 minutes after he had parted from Kaufman. The team was traveling right along, not walking. He appears as an indifferent witness, except that it was brought out on cross-examination that he had a hack stand, and had the privilege of standing his hack on the railroad company's property, and did business for the company occasionally.

The defendant also called Mrs. Storms, who lived about 300 feet from the track. She testifies that she went to bed about a quarter after 12 on the night of the accident. She heard a wagon pass by about that time. She fixes the time by the fact that she had guests that evening who had stayed until near 12 o'clock. She heard people singing and laughing outside; the people in the wagon—sounded like both men and women. The wagon was going very fast. She testifies that on this night she saw a light on the west side of the gatepost, and there was a light on the east side of the gate, and the gates were down, and there was a light on each side. She saw those lights as she looked out of her bedroom window. She had no light in her room. This was just before she heard the stage go by. The plaintiff, to shake her testimony, called a civil engineer, who gave testimony to the effect that a straight line drawn from the middle of the gate to the house would not touch the house, but would pass in front of it, and that a straight line drawn from the northerly post of the gate would only strike the corner of the house; hence it would be impossible to see the gate from any window in the house. On surrebuttal the defendant called Mullane, one of its claim agents, whose testimony was that one could see the gates from the window in the house.

The contention on the inferences, by the plaintiff, is that the gates were up at this time and that Kaufman was asleep in the shanty, and on hearing the near approach of the train jumped up, ran out, "and slammed the gate down," without observing the team upon the track, or, seeing it, he thought it would clear the rails, or, seeing that a collision was inevitable, thus acted to protect himself from criminal prosecution. The contention of the plaintiff is that the broken gates point to the conclusion that they were down and were run into, and that after the horses had broken through the first gatepost they dashed over the rails, and, although the vehicle was struck by the train, the horses passed over and broke the second gate. There is evidence to the effect that on two occasions teams of horses had struck this gate and broken through it, and the specific instances are given. An expert in the construction of gates testified that the force necessary to break a gate of this kind at the extreme point would be 100 pounds—a man running against it would break it; and 10 or 12 feet back of the extreme point it would take about 300 pounds.

The testimony of the said two survivors as to the location of the gates is not cogent. It is argumentative, and rather negative in its character, and these witnesses are confronted with testimony of their inconsistent and even contradictory statements from apparently respectable and uninterested witnesses. This testimony is met by the positive testimony of the gateman, of course an interested witness, and of two practically uninterested witnesses. The physical fact is that

the gates were broken. If they were down, then the explanation is simple and adequate; for they were in the way of this vehicle which passed beyond 'them. That a vehicle driven against a gate is suffi-cient to break it is shown both by expert testimony and by actual oc-currence. It is true that the horses bore no marks of impact, and that an argument contra can be made from some of the signs of the dis-aster. But it is not, I think, impossible that a team of horses could brush aside and break down a single wooden arm or two in succession without marks of impact, while the disaster wrought seems to me con-sistent with the theory that the horses broke through one wooden arm, dashed across the tracks, and then broke through the other wooden arm unharmed, although their vehicle was struck by the train and its passengers killed. The circumstances of this drive are not inconsist-ent with inattention to this single wooden barrier, or, perhaps, even with a reckless disregard of it, especially in consideration of the col-loquy testified to by the gateman as held with him by some of the par-ty on their earlier journey, which I need not reproduce. On the other hand, the explanation of how the arms of the gates, perpendicular in air at the time the wagonette reached the crossing, were broken, is much farther to seek, and is almost absolutely in the field of conjecture and speculation. Such explanation has afforded opportunity to the learned counsel for the respondent to display much ingenuity in his dis-cussion of the facts; but I am not satisfied with the verdict upon the evidence, and I think that the case should be submitted to another ju-ry. McDonald v. Met. St. Railroad Co., supra. While I refrain from discussion of other features of the case, I would not have it inferred that the question of the intestate's contributory negligence may not be an issue in the case upon the proof to be adduced. Brickell v. N. Y. C. & H. R. R. R. Co., 120 N. Y. 290, 24 N. E. 449, 17 Am. St. Rep. 648.

RICH, J., concurs.